UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ANTHONY LUERS, Plaintiff, | Case No. ____________________ |
| v. | |
| BUCKEYE PARTNERS, L.P., BUCKEYE GP LLC, CLARK C. SMITH, PIETER BAKKER, BARBARA M. BAUMANN, BARBARA J. DUGANIER, JOSEPH A. LASALA, JR., MARK C. MCKINLEY, LARRY C. PAYNE, OLIVER G. RICHARD, III, FRANK S. SOWINSKI, and MARTIN A. WHITE, Defendants. | **COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Anthony Luers ("Plaintiff"), by and through his attorneys, alleges the following upon information and belief, including investigation of counsel and review of publicly-available information, except as to those allegations pertaining to Plaintiff, which are alleged upon personal knowledge:

## NATURE OF THE ACTION

1. This action is brought by Plaintiff against Buckeye Partners, L.P. ("Buckeye" or the "Partnership") and the members of Buckeye's board of directors[1] (the "Board" or the "Individual Defendants") for their violations of Section 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15.U.S.C. §§ 78n(a), 78t(a), SEC Rule 14a-9, 17 C.F.R. 240.14a-9, and Item 1015 of Regulation M-A, 17 C.F.R. 229.1015, in connection with the

[1] As a limited partnership, Buckeye does not have its own internal board of directors, but instead is managed by the officers and directors of the General Partner, Buckeye GP LLC ("Buckeye GP"). The Proxy states that the officers and directors of Buckeye GP control Buckeye and it refers to them as officers and directors of Buckeye.

proposed merger (the "Proposed Merger") between Buckeye, and their affiliates, and IFM Investors, and their affiliates ("IFM").

2. On May 10, 2019, the Board caused the Partnership to enter into an agreement and plan of merger (the "Merger Agreement") with the IFM, pursuant to which, each Buckeye common unit will be converted into the right to receive $41.50 in cash (the "Merger Consideration").

3. On June 7, 2019, the Board authorized the filing of a materially incomplete and misleading preliminary proxy statement (the "Proxy") with the Securities and Exchange Commission ("SEC"), in violation of Sections 14(a) and 20(a) of the Exchange Act, that recommends Buckeye unitholders vote in favor of the Proposed Merger.

4. While Defendants are touting the fairness of the Merger Consideration to the Partnership's unitholders in the Proxy, they have failed to disclose material information that is necessary for unitholders to properly assess the fairness of the Proposed Merger, thereby rendering certain statements in the Proxy incomplete and misleading. Specifically, the Proxy contains materially incomplete and misleading information concerning: (i) the financial projections of the Partnership; (ii) the valuation analyses performed by Buckeye's financial advisor, Wells Fargo Securities, LLC ("Wells Fargo"), in support of its fairness opinion; (iii) the valuation analyses performed by Buckeye's financial advisor, Intrepid Partners, LLC ("Intrepid"); and (iv) Intrepid's conflicts of interest.

5. It is imperative that the material information omitted from the Proxy is disclosed to the Partnership's unitholders prior to forthcoming special meeting of Buckeye unitholders to vote on the Proposed Merger, so that they can properly exercise their corporate suffrage rights.

6. For the reasons as set forth in detail herein, Plaintiff asserts claims against Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act. Plaintiff seeks to enjoin

Defendants from holding the unitholder vote and consummating the Proposed Merger until the material information discussed below is disclosed to Buckeye unitholders.

**JURISDICTION AND VENUE**

7. This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331, federal question jurisdiction, as Plaintiff alleges violations of Section 14(a) and 20(a) of the Exchange Act and SEC Rule 14a-9.

8. Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over each defendant by this Court permissible under the traditional notions of fair play and substantial justice. "Where a federal statute such as Section 27 of the [Exchange] Act confers nationwide service of process, the question becomes whether the party has sufficient contacts with the United States, not any particular state." *Sec. Inv'r Prot. Corp. v. Vigman*, 764 F.2d 1309, 1315 (9th Cir. 1985). "[S]o long as a defendant has minimum contacts with the United States, Section 27 of the Act confers personal jurisdiction over the defendant in any federal district court." *Id.* at 1316.

9. Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because Defendants are found or are inhabitants or transact business in this District. Indeed, Buckeye's common units trade on the New York Stock Exchange, which is headquartered in this District, Buckeye retained legal counsel located in this District, the Proposed Merger is due to close in this District at 825 Eighth Avenue, New York, New York 10019, IFM and their affiliates, including the Merger Sub, are headquartered in this District, and IFM retained legal counsel located in this District rendering venue in this District

appropriate. *See, e.g., United States v. Svoboda*, 347 F.3d 471, 484 n.13 (2d Cir. 2003) (collecting cases).

## PARTIES

10. Plaintiff is, and has been at all relevant times, the owner of Buckeye common units and held such units since prior to the wrongs complained of herein.

11. Defendant Buckeye is a Delaware master limited partnership with its principal executive offices located at One Greenway Plaza, Suite 600, Houston, Texas 77046. The Partnership owns and operates a diversified network of integrated assets providing midstream logistic solutions, primarily consisting of the transportation, storage, processing and marketing of liquid petroleum products. Buckeye's common units trades on the NYSE under the symbol "BPL."

12. Defendant Buckeye GP LLC ("Buckeye GP" or the "General Partner") is a Delaware limited liability company, the general partner of Buckeye, a party to the Merger Agreement, and a signatory to the Proxy. Buckeye is a limited partnership and does not have their own board of directors. Buckeye is managed and operated by the officers of and subject to the oversight of the board of directors of the General Partner. However, the Proxy refers to the General Partner's officers and board of directors as Buckeyes officers and directors.

13. Individual Defendant Clark C. Smith is, and has been at all relevant times, a director of Buckeye GP, Chairman of the Board, and Chief Executive Officer of the General Partner.

14. Individual Defendant Pieter Bakker is, and has been at all relevant times, a director of Buckeye GP.

15. Individual Defendant Barbara M. Baumann is, and has been at all relevant times, a director of Buckeye GP.

16. Individual Defendant Barbara J. Duganier is, and has been at all relevant times, a director of Buckeye GP.

17. Individual Defendant Joseph A. LaSala, Jr. is, and has been at all relevant times, a director of Buckeye GP.

18. Individual Defendant Mark C. McKinley is, and has been at all relevant times, a director of Buckeye GP.

19. Individual Defendant Larry C. Payne is, and has been at all relevant times, a director of Buckeye GP.

20. Individual Defendant Oliver G. Richard, III is, and has been at all relevant times, a director of Buckeye GP.

21. Individual Defendant Frank S. Sowinski is, and has been at all relevant times, a director of Buckeye GP.

22. Individual Defendant Martin A. White is, and has been at all relevant times, a director of Buckeye GP.

23. The parties identified in ¶¶ 11-22 are collectively referred to as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

### I. Background and the Proposed Merger

24. Buckeye, incorporated on July 11, 1986, owns and operates a network of integrated assets providing midstream logistic solutions, primarily consisting of the transportation, storage, processing and marketing of liquid petroleum products. The Partnership's segments include Domestic Pipelines & Terminals, Global Marine Terminals and Merchant Services. Buckeye GP LLC (Buckeye GP) is the Partnership's general partner. The Company is an independent terminaling and storage operator in the United States in terms of capacity available for service. As

of December 31, 2016, their terminal network included more than 120 liquid petroleum products terminals with aggregate storage capacity of over 115 million barrels across its portfolio of pipelines, inland terminals and marine terminals located primarily in the East Coast, Midwest, and Gulf Coast regions of the United States and in the Caribbean.

25. IFM Investors Pty Ltd ("IFM Investors"), the principal advisor to IFM GIF, is a pioneer and leader in infrastructure investing on behalf of institutional investors globally. As of March 31, 2019, IFM Investors has approximately $90 billion of funds under management, including approximately $39.1 billion in infrastructure assets. IFM's principal executive office is located at 114 West 47th Street, 19th Floor, New York, New York 10036.

26. On May 10, 2019, Buckeye and IFM issued a joint press release to announce the Proposed Merger stating, in relevant part, as follows:

> **Buckeye Partners, L.P. Agrees to be Acquired by IFM Investors for $41.50 per common unit**
>
> **IFM Expands Midstream Energy Infrastructure Portfolio with Addition of Buckeye**
>
> **Transaction valued at $10.3 billion enterprise value and $6.5 billion equity value**
>
> HOUSTON and NEW YORK – May 10, 2019 – IFM Investors and Buckeye Partners, L.P. (NYSE: BPL) today announced a definitive agreement ("Agreement") under which the IFM Global Infrastructure Fund will acquire all of the outstanding public common units of Buckeye for $41.50 per common unit. The allcash transaction is valued at $10.3 billion enterprise value and $6.5 billion equity value. The acquisition price represents a 27.5% premium to Buckeye's closing unit price on May 9, 2019 and a 31.9% premium to Buckeye's volume-weighted average unit price since November 1, 2018, which is the last trading day prior to Buckeye's announcement of certain strategic actions. Buckeye's Board of Directors unanimously approved the proposed transaction with IFM. The closing of the merger will be subject to approval of a majority of the Buckeye unitholders, certain regulatory approvals and other customary closing conditions.
>
> Buckeye owns and operates one of the largest diversified networks of integrated midstream assets, including 6,000 miles of pipeline with over 100 delivery

> locations and 115 liquid petroleum products terminals with aggregate tank capacity of over 118 million barrels. Its network of marine terminals is located primarily in the East Coast and Gulf Coast regions of the United States, as well as in the Caribbean.
>
> IFM is a pioneer and leader in infrastructure investing on behalf of institutional investors globally, with a 23-year track record of success. IFM has $90 billion of assets under management, including $39.1 billion in infrastructure, which it manages on behalf of more than 370 institutional investors, and takes a longterm approach to investing, with no pre-determined time divestiture horizon. IFM targets core infrastructure in developed markets and currently has interests in 32 investments across North America, Australia and Europe, including several midstream assets.
>
> "This acquisition is aligned with IFM's focus on investing in high quality, essential infrastructure assets that underpin the economies in which they operate," said Julio Garcia, Head of Infrastructure, North America of IFM.
>
> "We are pleased to have the opportunity to bring the Buckeye business and management team under the IFM umbrella," said Jamie Cemm, Executive Director of IFM. "The proposed acquisition of Buckeye is a complementary addition to IFM's substantial investments in energy infrastructure across North America and globally. We look forward to supporting the continuing growth of the business."
>
> "Buckeye's Board of Directors recently reviewed strategic options for the business and determined that IFM's proposal to acquire Buckeye is in the best interest of Buckeye," said Clark C. Smith, Chairman, President and Chief Executive Officer of Buckeye. "The proposed transaction will provide immediate and enhanced value for our unitholders with an attractive premium that accelerates long-term returns and represents the underlying value of our business. In addition, the proposed transaction will provide Buckeye with superior access to capital to execute on its long-term business strategy. We look forward to this next chapter in Buckeye's 133-year story."

27. The Merger Consideration represents inadequate compensation for Buckeye units. It is therefore imperative that unitholders receive the material information (discussed in detail below) that Defendants have omitted from the Proxy, which is necessary for unitholders to cast an informed vote on the Proposed Merger and properly exercise their corporate suffrage rights.

## II. The Proxy Is Materially Incomplete and Misleading

28. On June 7, 2019, Buckeye filed the Proxy with the SEC in connection with the Proposed Merger. The Proxy solicits the Partnership's unitholders to vote in favor of the Proposed

Merger. Defendants were obligated to carefully review the Proxy before it was filed with the SEC and disseminated to the Partnership's unitholders to ensure that it did not contain any material misrepresentations or omissions. However, the Proxy misrepresents and/or omits material information that is necessary for the Partnership's unitholders to cast an informed vote on the Proposed Merger, in violation of Sections 14(a) and 20(a) of the Exchange Act.

The Misleadingly Incomplete Financial Projections

29. First, the Proxy provides incongruent metrics and incomplete sets of the various versions of the Partnership's financial projections, including the 2018 Management Case, the Updated 2018 Management Case, the Initial 2019 Management Case, the 2019 Projections, and the 2019 Management Case (the "Omitted Projections"). For the 2019 Management Case, the final revisions made to the Partnership's financial projections and the case of projections provided to Board, IMF, and Wells Fargo, the Proxy discloses Adjusted EBITDA, Total Capital Expenditures, Unlevered free cash flow, and Distribution per Partnership Unit. However, the summary in the Proxy of the Updated 2018 Management Case omits unlevered free cash flow projections and the summary of the 2018 Management Case omits unlevered free cash flow projections and Distribution per Partnership Unit. Additionally, the Proxy only discloses the year 2019 for the Initial 2019 Management Case and entirely omits the projections for 2020-2023.

30. The Omitted Projections are material information as acknowledged by the Proxy. In listing the Reasons for the Merger, the Proxy states that "the Board consulted with and received the advice of its financial advisors and outside legal counsel, discussed certain issues with the Partnership's management and considered a variety of factors weighing positively in favor of the merger, including the following *material* factors:"

> the Board's understanding of the Partnership's business, operations, financial condition, earnings, prospects, competitive position and the nature of the industry

> in which the Partnership and its subsidiaries compete, as well as the Partnership's historical and projected financial performance;

Proxy at 51 (emphasis added). Without the Omitted Projections, Buckeye's unitholders are unable to assess the changes made to the Partnership's financial projections as the sales process was carried out. Accordingly, Defendants present the Partnership's unitholders with only a fraction of the equation, rendering them unable fully assess the fairness of the Proposed Merger and the Merger Consideration.

31. Unlike poker where a player must conceal his unexposed cards, the object of a Proxy is to put all one's cards on the table face-up. In this case only some of the cards were exposed; the others were concealed. If a Proxy discloses financial projections and valuation information, such projections must be complete and accurate. The question here is not the duty to speak, but liability for not having spoken enough. With regard to future events, uncertain figures, and other so-called soft information, a company may choose silence or speech elaborated by the factual basis as then known—but it may not choose half-truths. Accordingly, Defendants have disclosed some of the projections, but have omitted others. Thus, their omission renders the projections disclosed on pages 64-66 of the Proxy misleadingly incomplete.

<u>The Misleadingly Incomplete Summary of Wells Fargo's Fairness Opinion</u>

32. The Proxy describes Wells Fargo's fairness opinion and the various valuation analyses performed in support of its opinion. Defendants concede the materiality of this information in citing Wells Fargo's fairness opinion among the positive, material factors the Board considered in making its recommendation to Buckeye unitholders. Proxy at 51. However, the summary of Wells Fargo's fairness opinion and analyses provided in the Proxy fails to include key inputs and assumptions underlying the analyses. Without this information, as described below, Buckeye's unitholders are unable to fully understand these analyses and, thus, are unable to

determine what weight, *if any*, to place on Wells Fargo's fairness opinion in determining how to vote regarding the Proposed Merger. This omitted information, if disclosed, would significantly alter the total mix of information available to Buckeye's unitholders

33. In summarizing the Discounted Cash Flow Analysis prepared by Wells Fargo, the Proxy fails to disclose the following key information used in their analysis: (i) the inputs and assumptions underlying the calculation of the discount rate range of 7.84% to 8.34% (including the values of the CAPM components from Buckeye and other MLPs used); (ii) the inputs and assumptions underlying the application of the perpetuity growth rate range of 1.00% to 2.00%; and (iii) the actual terminal values calculated for the analysis.

34. These key inputs are material to Buckeye unitholders, and their omission renders the summary of the Discounted Cash Flow Analysis incomplete and misleading. As a highly-respected professor explained in one of the most thorough law review articles regarding the fundamental flaws with the valuation analyses bankers perform in support of fairness opinions, in a discounted cash flow analysis a banker takes management's forecasts, and then makes several key choices "each of which can significantly affect the final valuation." Steven M. Davidoff, Fairness Opinions, 55 Am. U.L. Rev. 1557, 1576 (2006). Such choices include "the appropriate discount rate, and the terminal value…" Id. As Professor Davidoff explains:

> There is substantial leeway to determine each of these, and any change can markedly affect the discounted cash flow value. For example, a change in the discount rate by one percent on a stream of cash flows in the billions of dollars can change the discounted cash flow value by tens if not hundreds of millions of dollars….This issue arises not only with a discounted cash flow analysis, but with each of the other valuation techniques. This dazzling variability makes it difficult to rely, compare, or analyze the valuations underlying a fairness opinion unless full disclosure is made of the various inputs in the valuation process, the weight assigned for each, and the rationale underlying these choices. The substantial discretion and lack of guidelines and standards also makes the process vulnerable to manipulation to arrive at the "right" answer for fairness. This raises a further

> dilemma in light of the conflicted nature of the investment banks who often provide these opinions.

Id. at 1577-78.

35. Similarly, with respect to the Discounted Distributions Analysis, the Proxy fails to disclose the following key information used in their analysis: (i) the inputs and assumptions underlying the calculation of the discount rate range of 9.80% to 10.30% (including the values of the CAPM components from Buckeye and other MLPs used); (ii) the inputs and assumptions underlying the application of the perpetuity growth rate range of 0.00% to 2.00%; and (iii) the actual terminal values calculated for the analysis.

36. Without the above-omitted information Buckeye unitholders are misled as to the reasonableness and/or reliability of Wells Fargo's analyses, and unable to properly assess the fairness of the Proposed Merger. This is particularly relevant here, as the inputs purportedly based on the Partnership utilized by Wells Fargo change from one analysis to the next. As such, these material omissions render the summary of the Discounted Cash Flow Analysis and Discounted Distributions Analysis included in the Proxy misleading.

<u>The Proxy Fails to Disclose Intrepid's Valuation Analyses and Conflicts of Interest</u>

37. First, the Proxy states multiple times throughout its summary of the *Background of the Merger* that Intrepid performed and or presented financial analyses in its role as financial advisor related to the sales process and the value of the Partnership, including but not limited to pages 34, 41, 43, and 45. However the Proxy fails to provide any of these analyses for Buckeye unitholders to review. As Buckeye's financial advisor, the analyses Intrepid performed in the process leading up to Proposed Merger are material to Buckeye unitholders. Accordingly, the failure to disclose these analyses renders the corresponding statements describing them misleading.

38. Second, the Proxy fails to disclose any preexisting relationship or prior compensation between Intrepid on the one hand, and either Buckeye or IFM on the other. Disclosure of "relationship that existed during the past two years or is mutually understood to be contemplated and any compensation received or to be received as a result of the relationship between" a financial advisor and the subject company or its affiliates is required pursuant to 17 C.F.R. § 229.1015(b)(4). Such information is plainly material to Buckeye unitholders. It is imperative for unitholders to be able to understand what factors might influence the financial advisor's analytical efforts. A financial advisor's own proprietary financial interest in a Proposed Merger must be carefully considered when assessing how much credence to give its analysis. A reasonable unitholder would want to know what important economic motivations that the advisor, employed by a board to orchestrate the sales process and assess the fairness of the transaction to the unitholders, might have. This is especially true when that motivation could rationally lead the advisor to favor a deal at a less than optimal price, because the procession of a deal was more important to them—given their overall economic interest—than only approving a deal at truly fair price to unitholders. Therefore, the omission of the relationship between Intrepid and either Buckeye or IFM renders the statements pertaining to their engagement as financial advisor and involvement in the sales process materially incomplete and misleading, and in violation of 17 C.F.R. § 229.1015(b)(4).

39. In sum, the omission the of the above-referenced information renders statements in the Proxy materially incomplete and misleading in contravention of the Exchange Act. Absent disclosure of the foregoing material information prior to the consummation of the Proposed Merger, Plaintiff and other Buckeye unitholders will be unable to cast an informed vote on the

Proposed Merger and are thus threatened with irreparable harm, warranting the injunctive relief sought herein.

**COUNT I**

**On Behalf of Plaintiff Against All Defendants for Violations of Section 14(a) of the Exchange Act**

40. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

41. Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any Proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title." 15 U.S.C. § 78n(a)(1).

42. Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that Proxy communications with unitholders shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

43. Item 1015 of Regulation M-A requires "[a]ny report, opinion or appraisal relating to the consideration or the fairness of the consideration to be offered to security holders or the fairness of the transaction to the issuer or affiliate or to security holders who are not affiliates" to "[d]escribe any material relationship that existed during the past two years or is mutually understood to be contemplated and any compensation received or to be received as a result of the

relationship between: (i) The outside party, its affiliates, and/or unaffiliated representative; and (ii) The subject company or its affiliates." 17 CFR 229.1015

44. The omission of information from a Proxy statement will violate Section 14(a) and Rule 14a-9 if other SEC regulations specifically require disclosure of the omitted information.

45. Defendants have issued the Proxy with the intention of soliciting unitholder support for the Proposed Merger. Each of the Defendants reviewed and authorized the dissemination of the Proxy and the use of their name in the Proxy, which fails to provide critical information regarding: (i) the financial projections of the Partnership; (ii) the valuation analyses performed by Wells Fargo in support of its fairness opinion; (iii) the valuation analyses performed by Intrepid; and (iv) Intrepid's conflicts of interest..

46. In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading. Each of the Individual Defendants, as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a). The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Proxy, but nonetheless failed to obtain and disclose such information to unitholders although they could have done so without extraordinary effort.

47. Defendants knew or were negligent in not knowing that the Proxy is materially misleading and omits material facts that are necessary to render it not misleading. The Individual Defendants undoubtedly reviewed and relied upon most, if not all, of the omitted information identified above in connection with their decision to approve and recommend the Proposed Merger. Indeed, the Proxy states that Defendants were privy to and had knowledge of the financial projections and the details surrounding discussions with Wells Fargo and Intrepid. Defendants

knew or were negligent in not knowing that the material information identified above has been omitted from the Proxy, rendering the sections of the Proxy identified above to be materially incomplete and misleading. Indeed, the Individual Defendants were required to review Wells Fargo's analyses in connection with their receipt of the fairness opinion, question them as to their derivation of fairness, and be particularly attentive to the procedures followed in preparing the Proxy and review it carefully before it was disseminated, to corroborate that there are no material misstatements or omissions.

48. Each of the Individual Defendants were, at the very least, negligent in preparing and reviewing the Proxy. The preparation of a Proxy statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence. The Individual Defendants were negligent in choosing to omit material information from the Proxy or failing to notice the material omissions in the Proxy upon reviewing it—which they were required to do carefully. Indeed, the Individual Defendants were intricately involved in the process leading up to the signing of the Merger Agreement, the preparation and review of strategic alternatives, and the review of financial projections.

49. Buckeye and Buckeye GP are also deemed negligent as a result of the Individual Defendants negligence in preparing and reviewing the Proxy.

50. The misrepresentations and omissions in the Proxy are material to Plaintiff and other Buckeye unitholders, and will deprive them of their right to cast an informed vote regarding the Proposed Merger if such misrepresentations and omissions are not corrected. Plaintiff has no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

**COUNT II**

**On Behalf of Plaintiff Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act**

51. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

52. The Individual Defendants acted as controlling persons of Buckeye within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their positions as directors of Buckeye, through Buckeye GP, and participation in and/or awareness of the Buckeye's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of Buckeye, including the content and dissemination of the statements that Plaintiff contends are materially incomplete and misleading.

53. Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

54. In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of Buckeye, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same. The omitted information identified above was reviewed by the Board prior to voting on the Proposed Merger. The Proxy at issue contains the unanimous recommendation of the Board to approve the Proposed Merger. The Individual Defendants were thus directly involved in the making of the Proxy.

55. In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement. The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered. The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

56. By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

57. As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of the Individual Defendants' conduct, Plaintiff will be irreparably harmed.

58. Plaintiff has no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

**RELIEF REQUESTED**

WHEREFORE, Plaintiff demands relief in his favor and against the Defendants jointly and severally, as follows:

A. Preliminarily enjoining Defendants and their counsel, agents, employees, and all persons acting under, in concert with, or for them, from proceeding with, consummating, or closing the Proposed Merger until Defendants disclose the material information identified above that has been omitted from the Proxy;

B. Rescinding, to the extent already implemented, the Merger Agreement or any of the terms thereof, or granting Plaintiff rescissory damages;

C. Directing the Defendants to account to Plaintiff for all damages suffered as a result of their wrongdoing;

D. Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

E. Granting such other and further equitable relief as this Court may deem just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury.

DATED: June 20, 2019

Respectfully submitted,

*/s/ Juan E. Monteverde*
Juan E. Monteverde

**MONTEVERDE & ASSOCIATES PC**
The Empire State Building
350 Fifth Avenue, Suite 4405
New York, NY 10118
Tel.: (212) 971-1341
Fax: (212) 202-7880
Email: jmonteverde@monteverdelaw.com

*Counsel for Plaintiff*